Next case is once again Emergis Tech v. Otter Tail. It's case number 2007-1252. Mr. Callahan. You don't need to reload for the whole time period unless you have something new to add. I will try to add something new because in this case, your honors, we do not have the second issue that we discussed. That claim term was not an issue below. It was not a source of the court's ruling on summary judgment. The customer invoice number issue. That's correct, your honor. We collapsed it down to the directly issue. I think I've spoken on the directly issue in terms of its interpretation. The court has other questions. Directly and indirectly you've spoken on it. Pardon me, your honor? Directly and indirectly you've spoken on it. I just want to avoid that one on the other, your honor. All I can do is get it wrong. What I would say is factually we are in a somewhat different posture with respect to the Otter Tail system, the system that was accused of infringement in that case. In the Otter Tail system, the record evidence is quite significant that the distinction, if any, between Otter Tail and the vendor that provides the system for them, which is ePay, is invisible to the customers. Some of the record sites there are from A493 to A521. It's all branded with Otter Tail logos. All of the interface that the customer does with the website, I'm authorizing Otter Tail to display my billing and payment information. I authorize Otter Tail to deduct funds from the checkings and savings account that's at A519. I agree to notify Otter Tail of any unauthorized use of my registration. It goes on and on. But why is that relevant? Pardon me, your honor? The patent is billed as a less expensive, more direct way of billing. Why would customer perception be relevant? Well, it's less expensive. That's what's good for the biller. What's good for the customer is if the customer feels as if they're dealing with the vendor, with the invoicer. So the idea in the patent is to, as closely as possible, replicate the experience that we have with the bill that we get in the mail. We get the bill in the mail. We look at it. It comes from where I live, ComEd. I write out a check. I put it back in the envelope. I send it to ComEd. And it does not actually go to ComEd. It goes to a lockbox with a service that's run by ComEd. So in that sense, there's third parties too. But the inventor was trying to replicate that experience. Why is that important? In the context of the prior art, the consolidator model, we had a chicken or egg problem. Consolidator wants to have all the billers and all the customers come into their website. The one that's mentioned in the prosecution history is check-free. It's a chicken and egg problem. All of the vendors, all the people who have bills to go to pay, won't go and consolidate them at that website unless all the customers are already signed up. But a customer doesn't want to go sign up on this consolidated thing if they can only pay two of the 13 bills they have to pay every month. So that is why, Your Honor, I think it is important. One reason to customers, the other reason to invoicers. The difference between the first case and the second case is in the first case, the website you go to is called Bill Matrix. So it doesn't have the name of the invoicer on it? Well, it has both names on it. In the first case. In the second case, it only has Otter Tail on it. It's really moved even further into the background, if not disappear altogether. So that is the additional facts that I think are evident in the record on this issue. The claim interpretation issue is, in our view, the same. And I do want to say a couple of things about the claim interpretation issue, Your Honors. One, to address the argument that we're sort of interjecting HILT into this unnecessarily or even improperly. HILT is specifically incorporated, by reference, in column one of the patent as part of the patentee's description of what the prior art is. So it's a far stretch to say we're interjecting this. The language of the specification reaches out and pulls HILT in and draws the reader's attention to it. Additionally, and this goes back again to the case from this court last week, this was the key reference in the prosecution history. And there are some writings about it. The examiner says it's anticipated by HILT later. It is obviated by HILT in combination with one other reference. There are summaries, one line summaries of examiner interviews. But we assume and legally presume that the examiner did his job and was looking very closely at HILT. Looking very closely at HILT when he read HILT in the first instance to find all 99 of the claims either invalidated, either anticipated or obviated. And looking at HILT very closely as he was sitting down in examiner interviews with the patentee's attorney and as he was considering the arguments that the patentee made. So that is why I think this court's recent instruction to say the prosecution history, what we get there, isn't always a fulsome description of what went on. With respect to the HILT reference, I think we can say that confidently. This is not one of 13 different references that the examiner was relying on. This was it. This was the show. And so I don't think it is unfair at all to be looking into HILT at this court and at the district court at the same level of detail and with the same interest as we presume the examiner did when he was considering HILT in the context of the prosecution history. The second point, your honor, is this third party point. They say, and we say, not only are we directly, but we do it without third parties. We practice our invention without third parties. Again, another piece of evidence that says when we say later on in column A, we prefer, we strongly prefer, we recommend, we suggest that you outsource this, that outsourcing and a third party are two different beings. And when we go through, as we did, and I realize this court is loathe, district courts are loathe to start to construe the construction. Much like what you were saying before. Pardon me? This sounds very much as though you're repeating what you said before. I'm adding, your honor, the third party issue. We talk about directly and then say outsourcing. We also say we do it without a third party, but then talk about outsourcing. And when you look at what a third party is, and we've got a dictionary definition of this, again, a third party is somebody who's got a separate interest. And in this case, the Autotail case, it's quite clear that the interest of the outsourcer, what we would call them, is identical to the interest of Autotail. Autotail wants to allow its customers to review their bills electronically, make adjustments to their bills electronically, pay their bills electronically. The vendor comes in and says, Autotail, I will do that for you. I will allow them to look at, review, and pay their bills electronically. Those interests are identical. So in the legal sense of third party, in our view, your honors, they're really not a third party. I'd reserve whatever of my time the court will allow. Mr. Beat? Good morning, your honors. May it please the court, Tom Vitt for Autotail. I want to take us back to focus on the claim language. The claim term and issue in our case is, requires customer payment instructions to be sent from the customer directly to the invoicer. And three different district court judges agreed with our position that that means essentially what it says. The payment instructions have to go to the invoicer, and they have to go there directly without a third party intervening, through a third party. And I really think this is a much simpler case than Mr. Callahan is trying to make it, and there's a reason for that. All the intrinsic evidence on this is really straightforward. How does it help you? How does it what? How does it help you? What's the intrinsic evidence that helps you? All the intrinsic evidence helps me. All of it? All of it. And let's start with the specification here. Why don't I just try identifying, like, start with one. All right, let's start with one. The patent itself, the specification, describes at figure one a third party service provider system. And then at the bottom of column three and the top of column four, it describes that prior art system using a third party service provider. But that doesn't tell me whether a third party is or is not an agent. It doesn't help me. I think it actually does, Your Honor, and let me explain why it can't. The label agent, if it means that we sweep in a service provider like Princeton Econ or like Bill Matrix, can't be covered by this claim. And we can figure that out by looking at column three and column four. Putting the label agent on that would then mean that we've swept in figure one, the very prior art that they have distinguished. Because what figure one describes, as described in column three and column four, is a situation where the invoicer sends the billing information to what they call a third party service provider. That's exactly what happens. The prior art doesn't involve agents of the invoicer. I don't know what you get out of that. The prior art did not involve agents of the invoicer. It didn't involve sending it directly to the invoicer, right? The prior art involved payment instructions sent directly to a third party who was accepting those payment instructions. But it didn't involve sending it to the agent of the invoicer, right? That wasn't an issue with respect to the prior art. It's a label you're on. What I'm saying is our system is identical to the prior art. What's a label? The word agent is putting a legal label, and it is correct what Mr. Salyer said. How is it? I don't understand how it's the same as the prior art. The prior art involved third parties other than the invoicer. Now we have a patent which claims sending it directly to the invoicer. The question is, does that include the invoicer's agent? The invoicer's agent wasn't within the prior art, was it? It was because it's described here, if you define us as an agent, and I want to be absolutely clear, this is a new argument. We pointed out in our brief this argument was not raised below and has been waived. The claim construction advance below was, by Mr. Callahan, was the payment instructions have to go to the invoicer without use of a third party acting independently of. So there was no limitation just to agent, there was no discussion of that. You can regard those as two sides of the same coin. Let me, if I could just finish on column three and column four, because it absolutely answers the question, because we are identical. The prior art was a system where the invoicer sent to a third party service provider. It didn't say whether it was an agent or not. A third party service provider, the bill. And then the third party service provider sent the bill to the customer. And then the customer sent payment instructions back to the third party service provider, which then processed those payment instructions. That's described at columns three and four. And then emerges, the patent holder says, that is a cumbersome system, it takes too much time, and it costs too much money because of labor. That is our system. In other words, and that's how we litigated the case below. We explained in Jennifer Ross' declaration, appendix 124 to 129, that we do this exactly the same way as described in figure one. Ottertail sends a bill to Princeton Econ. Princeton Econ notifies the customer. The customer sends payment instructions back to Princeton Econ. And the payment instructions literally never go, never go to Ottertail. So what Mr. Callahan is advocating in this court today and below is the words in the patent that say the payment instructions have to go directly to the invoicer are meaningless. Because we're going to accuse you of infringement even though you're just like figure one. And even though- He's not saying that. He's admitting that. He's saying that a principal and the agent are the same thing. And he certainly is admitting, as I understand it, that if there's an independent third party that's involved here, that that's not sending it directly to the invoicer. But if it's the invoicer's agent, then the agent is the same as the invoicer. It's not a foolish argument. Whether it's correct or not, I don't know. But you keep talking about the language third party is resolving this. I don't see that. All right. Your Honor, it wasn't litigated any other way than that below. So that's important. But it's also, it's equally important to pick up on the first thing you said. Emergis absolutely has admitted that we are figure one. We have made a huge point of this all through the record below. It was never disputed. We made a huge point of it on our brief here. It's never been disputed. It can't be disputed. Our system operates exactly like the prior art that Emergis distinguished to get the patent by putting the word directly in. So it can't be that directly now means something that covers what's shown in figure one in the prior art because I'm not going to put the label agent on it. Okay? It just cannot be. It's a plain construction matter. Second point I'd like to make. Where does the word agent appear in figure one? It does not, Your Honor. So how does it answer the question? It answers the question simply as I've said, and I apologize if I'm repeating myself, that the system, if you use, if you call it an agent or a third-party service provider, if the customer payment instructions use somebody else other than the invoicer to process this, it adds time and it adds expense, just as is explained in column three and column four, and just as we've explained that we are identical to that. It's also important to understand. There was no argument made below on the infringement side that we really weren't a third-party service provider, that we were really an agent. That argument was not made. So there is no record evidence to establish that we are an agent. In fact, Princeton Econ has a contract, as Judge Pijarza mentioned earlier in the first argument. We have a service contract with Emergis, not in the record because this issue was not raised below. It was waived, Your Honor. Okay? I want to address the HILT reference because I think there's been a pretty serious misunderstanding presented to you about the HILT reference. The implication has been that HILT somehow defines directly in reference to banks as including their agents, and that's actually not what HILT does. If you look at page 455 of the appendix, this is where the word directly is used, and it simply says, it uses the word really in its ordinary way. It says, consumers and billers, consumers and billers, not banks, participate in the bill pay system, but they need not deal with the many consumers or many billers. I'm sorry, where is it? It's page 455, it's column 12, line 48, Your Honor. Okay. So it's using the word directly in its ordinary way to mean you're dealing with somebody else other than the consumer or the biller, dealing with it directly. And then later when it's talking about the banks that are involved in this system described in HILT, it says a bank is a reference, also includes somebody who runs the computer system for the bank. So there's no special definition of directly the HILT that they can rely on. Judge Moran, your question earlier, where do I look in the intrinsic record to support Mr. Callahan's argument, is completely absent. What they said to distinguish HILT, they didn't say, we only mean to distinguish third-party service providers who aren't agents. We only mean to distinguish third-party service providers who are independent. If you're not independent, we're not distinguishing you. Instead they broadly distinguished all of them because in column 3 and 4 of their patent they explain how using a third-party takes more time and costs more money. They said, this is what they said in the file history, not what Mr. Callahan says now, but what they said, unlike the prior record, the present invention eliminates the problems associated with using a third-party service provider. Full stop. And then they reference the very part of the specification I was just referring to, and this is appendix page 272. So they can't now come into court and say, we only meant to distinguish third parties who were truly independent. Because that's not what the patent was about. The patent was about saving time and money by going direct. We're really through the looking glass here, Your Honor, on this whole argument. All of the intrinsic evidence, everything that I've just mentioned, all supports the common sense claim language that the payment instructions, they have to go to the invoicer. That's what it says. And they have to go there directly. That's what it says. It's just really no less complicated than that. So you're saying it doesn't matter whether it's an agent or an independent contractor. It does not, Your Honor. Because the patent distinguished over that type of a system that had that extra step in it very explicitly and very broadly. Explicitly? It distinguished explicitly agents? Not using the word, Your Honor, but it distinguished any system that had that extra step, whether you call it an agent or call it a third-party service provider. Let me just address, if I could, the infringement side of the case, and that can be done relatively quickly because it follows from the claim construction. There's no dispute that Princeton Econ is a third-party service provider. They've admitted that. Emerges said in their brief below, Princeton Econ, and I quote, is an independent third-party vendor that is operating independently from Otter Tail. That's appendix page 411. Now, they said that about the collect pay system, that they don't accuse of infringement, which, interestingly, is exactly like the Bill Matrix system, that they do accuse of infringement. In other words, there's a notice to the customer that when you use collect pay, which is a credit card system, you're going to Princeton Econ's website. The other important thing is, we heard from Mr. Callahan about the customer perception, and Judge Graham asked him, well, why is that relevant? It's not relevant. The patent is about how this works. It says, customer payment instructions have to be sent directly to the invoicer. It doesn't matter what the customer perceives. They could have written a claim about customer perception. They didn't. And so they've accused collect pay, our system where the customer does know it works identically to the system they did accuse. In other words, in both systems, the customer payment instructions go to Princeton Econ, and they never go to Otter Tail. So those two points cannot be reconciled. You can't accuse one and not accuse the other and make some difference based on something that's not in the claim. The final point I'd like to make is this argument that we infringe because there's at least a fact question because there's a fact question about whether Princeton Econ is an agent was not raised below. They point to an oral argument citation where they use the word agent at the very end of the oral argument. It's not good enough to raise something in passing in oral argument. We never got a chance to respond. The judge didn't consider it. Clearly, the judge's claim construction and his ruling was based on the premise that any third party would avoid infringement because of the reasons I've said. And I would just like to give the court two sites from your own jurisprudence that stand for the proposition. You can't raise an argument for the first time on appeal that you've only raised in passing an oral argument below. One case is the Smith-Klein v. Beecham case, 439, Fed Third, 1312, page 1320. It's a 2006 case. It talks about there, at least in that case, it was raised in a footnote. The court said, this court said, not good enough. And the second case is the Wallace case, 879, F. Second, 829. The jump site there is 832, 833. That's a 1989 case where it was raised in oral argument. The court again said, not good enough. You have to allow the other party some chance to respond. So clearly, we don't infringe ultimately because we are figure one of the prior art. That's undisputed in the record. That's what they distinguished to get the patent. And this second argument doesn't change that. Thank you. Thank you. Thank you, Mr. Beecham. Mr. Callahan. Your Honor. I have three points. I'll try to be brief. One, it's our understanding of the law that it is not a defense to patent infringement to say you're practicing the prior art. So as Mr. Vint stated today and stated repeatedly below. Second, we did not weigh this argument. We made it. It wasn't in passing. It was the summary of what is in the record at A-16. A-16? A-619. I'm sorry, Your Honor. A-619. Thanks for correcting me. Through A-654. And in summarizing our argument, I stated to the court, in our view, even under their definition, this is when we were talking about the definition that the court adopted. I was saying there were still factual issues to be resolved. Even under their definition, even under the definition of where they say, without the intervention or involvement of a third-party service provider, this is a situation where I think it couldn't be more clear that whether we look at the black-letter legal concept of agency or the concept of standing in the shoes of another party, Princeton e-comm fits that to a T from all perspectives. So this was raised clearly with the opportunity, if you look through the remainder of that transcript, Your Honors will see that Mr. Vitt had an opportunity to respond and did, in fact, respond. So this was an issue that was discussed. Next point, Mr. Vitt cited this court to the record at A-411 as if it were an admission on this system. I just want to be clear. The court looks at the record at A-411. It is a discussion with respect to a system that is not at issue before this court on this appeal. And lastly, on the issue of third-party service providers, there is this question about where that term, if at all, is defined. And I think third-party service providers not only define, but it gives specific examples of it. In the patent, in the record at A-51, column 1, line 27, attempts have been made to automate this process through the use of third-party service providers. You go down in that paragraph. Such electronic systems are described in, and they describe several patents, including U.S. patent number 5465-206 issued to HILT et al., the disclosures of which are hereby incorporated by reference in their entireties. And as we know, as we discussed this morning, Your Honors, HILT, which is by definition a third-party service provider model patent, is what we spent so much time going back and forth with the examiner on, and which ultimately, when the examiner understood the difference between that type of system and a direct system, whether it uses an outsourced component or not, is what led to the issuance of the claims. Thank you very much, Your Honors, for your attention and your time this morning. I appreciate it.